People v Sidbury (2024 NY Slip Op 03318)

People v Sidbury

2024 NY Slip Op 03318 [42 NY3d 497]

June 18, 2024

Wilson, Ch. J., J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, January 15, 2025

[*1]

The People of the State of New York, Respondent,
v
Steven Sidbury, Appellant.

Argued May 16, 2024; decided June 18, 2024

People v Sidbury, 206 AD3d 413, reversed.

{**42 NY3d at 500} OPINION OF THE COURT

Chief Judge Wilson.

Defendant Steven Sidbury has been evaluated and treated for various mental illnesses since childhood. He has been incarcerated since 2013, first in pretrial detention while awaiting trial for a homicide and related charges, and subsequently upon conviction of those charges. While awaiting trial, Mr. Sidbury was placed in solitary confinement at Rikers Island. In 2014, he set fire to a stack of papers inside the "cuffing port" of his solitary cell door. He was charged with arson in the second degree, a B violent felony offense.
Mr. Sidbury was subsequently convicted, after a jury trial, of arson in the second degree and sentenced to 25 years in prison. The Appellate Division unanimously modified the judgment, in the interest of justice, by reducing the sentence term to 10 years, but otherwise affirmed.
On appeal, Mr. Sidbury raises three issues. First, he contends that the trial court erroneously precluded him from presenting psychiatric evidence in his defense. Second, he contends that the evidence was legally insufficient to convict him of arson in the second degree. Third, he contends that his trial counsel was ineffective for requesting a charge on fourth-degree arson instead of fifth. We now reverse and remit for a new trial solely on the preclusion of the psychiatric testimony.
I.
Steven Sidbury first showed symptoms of mental illness when he was in daycare and was first prescribed psychiatric{**42 NY3d at 501} medication at the age of 10, while he was in foster care. His medical records show that he has attempted suicide and has been psychiatrically hospitalized multiple times—diagnosed with borderline personality disorder, post-traumatic stress disorder, and bipolar disorder.
[*2]
In 2013, when he was 20 years old, Mr. Sidbury was arrested and indicted for murder in Brooklyn. He was incarcerated on Rikers Island following his arrest and remained there for the next several years awaiting trial on that indictment.[FN1] Over the course of the several years he was held on Rikers Island and elsewhere, Mr. Sidbury was charged with multiple other offenses. One such charge came as a result of Mr. Sidbury setting fire to papers inside the "cuffing port" of his cell door while in solitary confinement in Rikers Island.
A "cuffing port," also known as a "food box," is a metal box built into each cell door to pass items into the cell or to handcuff an individual inside the cell from the outside of it. The port has two plexiglass lids—one facing outside the cell and one facing inside the cell. The dimension of the cuffing port is 18 by 12 inches.
After a correction officer smelled a burning odor, he walked over to Mr. Sidbury's cell. He saw a fire in Mr. Sidbury's cuffing port, which he reported to another officer, who looked through the plexiglass lid and saw smoking debris and papers but no flames. The officer then concluded that Mr. Sidbury had set fire to some papers inside the port, retrieved a spray can of water, and extinguished the debris. The fire damaged the interior plexiglass lid, which was bubbled and discolored; there were also some burn marks on the metal. He was charged with arson in the second degree, a B violent felony offense.
Mr. Sidbury was evaluated multiple times for competency to stand trial pursuant to CPL 730.30.[FN2] The examiners had no access to and thus did not review any records of his mental health{**42 NY3d at 502} treatment prior to his incarceration at Rikers Island, but instead were limited to records created by Rikers Island staff. The staff—believing he was "malingering" symptoms to "control some of the things that happened to him while incarcerated"—diagnosed him with antisocial personality disorder [*3]and adjustment disorder with mood and conduct disturbances. After three years of these evaluations, the examiners concluded that he did not presently have a "major mental illness," and he was therefore declared fit to proceed to trial.
Throughout this time, Mr. Sidbury was represented by the Legal Aid Society. Following the section 730.30 competency evaluations, however, Mr. Sidbury's representation within the Legal Aid Society changed. On July 18, 2018, about 45 days after becoming his attorney of record, Mr. Sidbury's new counsel served notice, pursuant to CPL 250.10, of his intent to offer psychiatric evidence in support of "the affirmative defense of lack of criminal responsibility by reason of mental disease or defect . . . and/or . . . in connection with any other defense" (see CPL 250.10 [1] [a], [c]). The evidence included testimony from Dr. Eric Goldsmith, a board-certified forensic psychiatrist and professor at New York University's School of Medicine, who planned to testify that Mr. Sidbury lacked the capacity to commit arson in the second degree on the date of the cuffing-port fire.
The trial court rejected Mr. Sidbury's request to accept his late notice of intent to provide a psychiatric defense based on lack of capacity. The court noted that CPL 250.10 provides such notice should be served within 30 days of arraignment and that Mr. Sidbury's notice was more than 1,400 days late. Mr. Sidbury's counsel responded that, at that point, he had only been on the case for 60 days, and the court responded that this was "an ongoing and pointless exercise in dilatory tactics" as Mr. Sidbury had prior "competent counsel" and there had been no finding of incompetence. Counsel noted the records and reports the court was relying on regarding competency had been written pursuant to CPL 730.30 rather than 250.10—two {**42 NY3d at 503}separate statutes requiring different psychiatric evaluations directed at different legal issues. Despite recognizing that CPL 250.10 would require admission of the late psychiatric evidence if needed to afford a defendant "substantial justice," the court refused to entertain the possible admission of the testimony, stating:
"What's missing in this case is your claim is invalid. There's no substantial justice in recognizing this claim. There's no substantial justice related to any claim that your client is incompetent. This is all a history of dilatory tactics. I'm not putting up with it anymore. The case is going to trial now."
Mr. Sidbury's counsel asserted that because they were still in the pretrial stage of this case, with 52 days before the start of jury selection, there was enough time for Mr. Sidbury to be examined by the People's expert without delaying the trial. Counsel also stated that precluding Dr. Goldsmith from testifying would interfere with Mr. Sidbury's constitutional right to present a defense. Counsel reiterated that the legal standard for CPL 250.10 was different from whether Mr. Sidbury was competent to stand trial pursuant to section 730.30. At that point, the court rejected Mr. Sidbury's application because there was "nothing that establishe[d] a basis for believing that [he] lacked capacity. You're putting in a claim saying that [you're] going to speak to a doctor, [and] maybe he's going to find this."
Because of the court's refusal to allow Mr. Sidbury to call Dr. Goldsmith as a witness pursuant to CPL 250.10, Mr. Sidbury's counsel made an application for Legal Aid to be relieved from representing him, which the court denied. Counsel's supervisor from the Legal Aid Society subsequently made an application in front of the court in response to that denial. She conceded that the untimeliness of the CPL 250.10 notice was a "malfeasance" by the Legal Aid Society. She acknowledged that because the court was denying Mr. Sidbury his right to present a defense due to counsel's malfeasance, another attorney from a different office might be in a more advantageous position. In response, the court replied:
"I take issue with what you're saying that there's malfeasance. I don't think there's malfeasance. I think that there was a rational and reasonable decision made by the attorneys in this case that there{**42 NY3d at 504} was no psychiatric defense . . . there is no psychiatric issue. There is a malingering issue. There is a wonderful act that he puts on. There is this calculated effort to interrupt and defeat a trial . . . On the one occasion he was found unfit. They sent him back within 30 days . . . your client does not possess a psychiatric defense. Your client does not possess a psychiatric issue. He's a pain in the neck; I have to agree. He's annoying. He's obnoxious. He's offensive. He's interrupting. But everything is calculated on his part to impede a trial and to defeat everybody's interest. He is basically a person who has determined that he has nothing to lose so why not throw it all out there and be as impossible and difficult as you wish. Now, I think that's psychiatric."
Counsel's supervisor detailed Mr. Sidbury's psychiatric history and replied that it was not "mutually inconsistent to be a pain in the ass, to be manipulative[,] and to suffer from serious psychiatric problems," to which to the court replied, "we fundamentally disagree." It said:
"I'm sorry; there has to be a line drawn between the possible existence that he is not completely free of psychiatric issues and the finding that he is, on the basis of his psychiatric issues so flawed . . . I mean, I appreciate the fact that he may have some issues, but are those issues such as to [re]quire a 250.10 notice and a defense based on that kind of circumstance? And I say no . . . because I've observed this defendant for four years and his conduct over the last three to four years. And I say that the kind of conduct that he has demonstrated, both today and every other day that he's appeared here, is calculated conduct. His conduct is always to one objective and that is to interfere with the trial, to interfere and defeat and impede the proceedings that we have here. He does not manifest these other issues as a person who is, in fact, psychiatrically flawed in other respects. He doesn't, as far as I can tell, satisfy the diagnosis criteria."
The court once again denied the request for counsel to be relieved and ruled the CPL 250.10 notice was untimely, and the case proceeded to trial.{**42 NY3d at 505}
At the close of testimony, Mr. Sidbury's counsel moved to dismiss the charge of arson in the second degree, arguing instead that the jury should be presented with the lesser included charge of arson in the fifth degree. Counsel argued that the prosecution had not presented evidence that Mr. Sidbury burned a "building" as required by Penal Law § 150.15, but that the cuffing port, which was akin to a garbage can, was "property of another," consistent with arson in the fifth degree. The court denied the motion and charged the jury as to arson in the second and third degrees. On September 26, 2018, the jury found Mr. Sidbury guilty of arson in the second degree. Despite acknowledging that he had already been sentenced to 40 years' incarceration on the Brooklyn manslaughter and weapons possession charges, and that his total sentence would be statutorily capped at 50 years, the court sentenced him to the maximum term of 25 years in prison because it was "symbolic," and the court wanted to "punish him."
Mr. Sidbury appealed, arguing: (1) his conviction was not supported by legally sufficient evidence because the damage was limited to the cuffing port, which was not a "building" as defined in the statute; (2) the trial court's misapplication of CPL 250.10 deprived him of his right to present a defense and call witnesses under the State and Federal Constitutions; and (3) his trial counsel was ineffective for failing to request a charge on the lesser included offense of arson in the fourth degree.
[*4]
The Appellate Division unanimously modified the judgment, in the interest of justice, by reducing the sentence term to 10 years rather than 25 years, and otherwise affirmed (206 AD3d 413, 413-414 [1st Dept 2022]). The Court held that the evidence was legally sufficient to support his conviction for second-degree arson; that the preclusion of Dr. Goldsmith's testimony was permissible; and that Mr. Sidbury's ineffective assistance of counsel claim was unreviewable in the absence of a motion under CPL 440.10 (id. at 414-415). Notably, the Court reasoned that counsel's CPL 250.10 notice was both "grossly untimely and lacking any showing that the proffered psychiatric expert testimony would be relevant to a particular defense" with "no excuse offered except law office failure" (id.). The Court determined that because Mr. Sidbury had been represented by the same "institutional provider" throughout the proceedings and had undergone two CPL article 730 examinations, counsel would have been alerted to "potential psychiatric issues" ({**42 NY3d at 506}id. at 415). The Appellate Division further concluded that counsel's notice did not meet the standard set out in People v Almonor (93 NY2d 571 [1999]) as it "did not 'contain enough information to enable the prosecution and the court to discern the general nature of the alleged psychiatric malady and its relationship to a particular, proffered defense' " (206 AD3d at 415, quoting Almonor, 93 NY2d at 581). In sum, the Court found the result of Mr. Sidbury's "730 examinations, his behavior in the courtroom, and his history of dilatory tactics supported the court's conclusion that defendant was malingering and had no valid psychiatric defense" (id.). In the alternative, the Court found no error—constitutional or otherwise—contributed to his verdict (id.).
A Judge of this Court granted Mr. Sidbury leave to appeal (39 NY3d 942 [2022]). We now reverse and hold that the trial court's application of CPL 250.10 precluding Mr. Sidbury's psychiatric defense was an abuse of discretion.
II.
A.
We have been clear that the governing principle animating CPL 250.10 is "procedural fairness and orderliness" with the intention of "eliminating the element of surprise" for the prosecution (see Almonor, 93 NY2d at 577-578, 581-582; see also People v Gonzalez, 22 NY3d 539, 548 [2014]; People v Diaz, 15 NY3d 40, 46 [2010]; People v Berk, 88 NY2d 257, 263-265 [1996]; People v Segal, 54 NY2d 58, 64 [1981]; Ronson v Commissioner of Corr. of State of N.Y., 604 F2d 176, 178, 179 [2d Cir 1979]). The statute formulates a procedure for defendants to serve notice of their intent to present psychiatric evidence that is "prepared and presented manageably and efficiently," such that it allows for "proper notification, adversarial examination, and preclusion when appropriate" (Almonor, 93 NY2d at 578).[FN3]
Under the statute, "psychiatric evidence" is defined as "[e]vidence of mental disease or defect" to be offered by the defendant in connection with the defense of lack of criminal responsibility by reason of mental disease or defect, extreme emotional disturbance, or any other defense (CPL 250.10 [1] [a], [b], [c];{**42 NY3d at 507} see also [*5]Diaz, 15 NY3d at 45). Such evidence is "not admissible upon a trial unless the defendant serves upon the [P]eople and files with the court a written notice of his intention to present psychiatric evidence" (CPL 250.10 [2]). The statute "contemplates that the notice contain enough information to enable the prosecution and the court to discern the general nature of the alleged psychiatric malady and its relationship to a particular, proffered defense" (Almonor, 93 NY2d at 581). In cases where the defense is not yet able to make a determination as to the "viability of a particular psychiatric defense and its psychiatric basis," the statute permits making amendments to the notice and does not prescribe a time within which such amendments must be made (id. at 582).
Although the statute provides for service of the notice within 30 days of the defendant's not-guilty plea, the court has discretion to permit service of a late notice "[i]n the interest of justice and for good cause shown" (CPL 250.10 [2]). Late notice is permissible "at any later time prior to the close of the evidence"—including after trial has commenced (id.).
The decision to permit late notice is within the discretion of the trial court (see Berk, 88 NY2d at 265-266). That discretion, however, is "not absolute," because "[e]xclusion of relevant and probative testimony as a sanction for a defendant's failure to comply with a statutory notice requirement implicates a defendant's constitutional right to present witnesses in [their] own defense" (id. at 266). Instead, the trial court must "weigh [the defendant's constitutional] right against the resultant prejudice to the People from the belated notice" (id.).
The Sixth Amendment to the United States Constitution, applicable to the States under the Fourteenth Amendment, guarantees a criminal defendant the right of "compulsory process to call witnesses in [their] favor" (Ronson, 604 F2d at 178). "While a defendant's right to call witnesses on [their] behalf is not absolute, a state's interest in restricting who may be called will be scrutinized closely" where "maximum 'truth gathering,' rather than arbitrary limitation, is the favored goal" (id.). The Supreme Court of the United States has determined that the preclusion of an entire defense for violating a notice statute to be generally inappropriate, where "alternative sanctions" are likely to be "adequate and appropriate in most cases" (Michigan v Lucas, 500 US 145, 152 [1991], citing Taylor v Illinois, 484 US 400, 413 [1988]). Recognizing the legitimate state interests that notice requirements serve—"protecting against {**42 NY3d at 508}surprise, harassment, and undue delay"—the Supreme Court has also observed that the severest sanction of preclusion is justified only when the violation amounts to "willful misconduct" and was designed to obtain a "tactical advantage," or where a less severe penalty would "perpetuate rather than limit the prejudice to the State and the harm to the adversary process" (Lucas, 500 US at 152-153, citing Taylor, 484 US at 413, 417).
B.
[1] The trial court abused its discretion as a matter of law and impinged Mr. Sidbury's constitutional right to present a defense and call witnesses when it improperly precluded his psychiatric defense under CPL 250.10. To sanction a [*6]defendant for failure to comply with the statutory notice requirement, the court must weigh the defendant's constitutional right to a defense against prejudice to the People from late notice (see Berk, 88 NY2d at 266; see also Almonor, 93 NY2d at 582). The court did not conduct that balancing. Instead, the court substituted competency examinations (one of which had determined that at a prior point Mr. Sidbury was not competent to stand trial) and its own lay analysis of Mr. Sidbury's mental health to incorrectly and prematurely impose the severest sanction for counsel's violation of the notice statute.
Counsel presented written notice that identified the categories of psychiatric evidence set forth in CPL 250.10 he wished to bring. The notice stated that Mr. Sidbury intended to present "[p]sychiatric evidence in connection with the affirmative defense of lack of criminal responsibility by reason of mental disease or defect" and "[e]vidence of mental disease or defect in connection with any other defense, pursuant to CPL § 250.10(1)(c)." Attached to the notice was a curriculum vitae for counsel's proposed psychiatric expert, Dr. Eric Goldsmith.[FN4]
On the record, counsel identified Mr. Sidbury's history of mental illness and diagnoses, delineated what the expert's report would indicate, and explained the reason for the delayed notice multiple times to the court. Counsel explained that Dr.{**42 NY3d at 509} Goldsmith had tentatively concluded that Mr. Sidbury was unable to understand the nature and consequences of his actions at the time of the crime and therefore should not be found culpable. When asked on what basis Dr. Goldsmith would reach that conclusion, counsel stated that the expert would need to examine Mr. Sidbury first. Although Dr. Goldsmith had evaluated Mr. Sidbury's competency to stand trial several times since May 2016, because those conclusions were based only on records from Rikers Island staff, rather than on Mr. Sidbury's entire psychiatric history, and because those conclusions concerned Mr. Sidbury's competency to stand trial at a given point in time rather than whether he had the requisite mental capacity to commit arson in January of 2014, counsel stated that Dr. Goldsmith needed a short amount of time to examine Mr. Sidbury and write up a report with his new conclusions. Counsel requested that the court adjourn so that Dr. Goldsmith could do so and suggested that in two weeks he could provide further detail, which would still have been nearly a month before the scheduled start of trial.
Even if the court believed the written notice should have been more detailed, the remedy should have been a brief adjournment to allow counsel to amend the notice, not the premature preclusion of the defense. As we highlighted in Almonor, in some cases, amending a notice may be warranted, "owing to circumstances and [*7]developments that vary from case to case," but it is subject to the court's determination as to "good cause, timeliness, prejudice, and other appropriate considerations" (id. at 582). Here, the trial court considered timeliness, but did not consider prejudice or any other appropriate considerations, before precluding Mr. Sidbury from presenting a defense.
Turning to the timeliness of the notice, the trial court's failure to balance prejudice to the People resulting from the delayed notice against Mr. Sidbury's constitutional right to present a defense was an error of law. Although the dissent alleges we "misunderstand[ ] the CPL 250.10 and Sixth Amendment standards and mandate[ ] a showing of prejudice where none is required" (dissenting op at 
522), the "consideration of whether excusing the procedural requirements would prejudice the prosecution" (id. at 
520) is embedded in New York State decisional law (see e.g. Almonor, 93 NY2d at 582; Diaz, 15 NY3d at 47; Berk, 88 NY2d at 266; Gonzalez, 22 NY3d at 548). Indeed, just as our dissenting colleagues note that CPL 250.10{**42 NY3d at 510} was enacted to "eliminat[e] the element of surprise" (dissenting op at 
517-518, citing Almonor, 93 NY2d at 578), our case law carefully acknowledges that this very "rule further protects the People from the prejudice caused by 'surprise' mental health evidence" (Gonzalez, 22 NY3d at 548 [emphasis added]).
Here, the People never asserted that the late notice would prejudice them. Even when defense counsel asserted in open court that the People would suffer no prejudice, the People did not dispute that statement in any way. Although the People now contend that they would have been prejudiced because the long untimeliness of the notice prevented them from examining Mr. Sidbury close in time to the arson, that argument is unpreserved for our review because the People did not state it—or make any claim of prejudice—in the trial court (see People v Baumann & Sons Buses, Inc., 6 NY3d 404, 407, 408 [2006]).[FN5]
The trial court did not consider potential prejudice to the People or alternatives that might cure any prejudice, such as a delay of the trial, a sanction short [*8]of preclusion, or a limitation on the scope of Dr. Goldsmith's testimony. The court never once mentioned prejudice in its analysis, relying instead on the length of delay and the court's own conclusion that Mr. Sidbury's "malingering" demonstrated that he possessed the legally requisite mens rea at the time of the arson.[FN6] Moreover, Mr. Sidbury's counsel explicitly stated that he would have a{**42 NY3d at 511} more detailed report in two weeks—an adjournment period that would still afford the People a month before the start of jury selection. Where there is no prejudice to the People, and where the result of preclusion is to deprive a defendant of due process, a decision to deny such an adjournment must consider whether doing so has the "disproportionate effect of punishing [a] defendant for . . . counsel's dereliction by depriving [the defendant] of a defense" (People v Hartman, 64 AD3d 1002, 1005 [3d Dept 2009]). Both our case law and the United States Supreme Court case law emphasize the predominance of the right to a fair trial over purely procedural requirements, especially where no prejudice would result from waiver of a deadline (see Diaz, 15 NY3d at 47; Washington v Texas, 388 US 14, 22-23 [1967]; Wardius v Oregon, 412 US 470, 475-476 [1973]; Chambers v Mississippi, 410 US 284, 295 [1973]).
Beyond failing to consider prejudice, the trial court also did not explicitly consider whether the delay was in good faith. The only cause offered here was law office failure. That representation should be understood, however, in the context of a defendant who was waiting for several years to be tried on several different matters, pending in different courts within New York City, and who was sometimes held in facilities outside of New York City—including one near the Canadian border—and whose fitness to stand trial was fluctuating and uncertain.[FN7] In {**42 NY3d at 512}any event, the record [*9]does not support a finding that the delay was intentional or provided any sort of advantage to Mr. Sidbury.
The court based its preclusion of the proffered expert testimony in part on its own diagnosis that Mr. Sidbury was competent and manipulating the system. It reached that conclusion in part by equating two distinct determinations that are not equivalent—whether Mr. Sidbury had the mental capacity to stand trial pursuant to a CPL 730.30 evaluation, and whether Mr. Sidbury had the requisite mens rea to commit the crimes charged pursuant to CPL 250.10.[FN8] Our dissenting colleagues also erroneously equate the two disparate standards (see dissenting op at 
523, 524). As the Supreme Court has noted, evaluating a defendant's competency is a present-tense determination, related to a defendant's capacity to understand legal proceedings (see Dusky v United States, 362 US 402, 402 [1960]). By contrast, the psychiatric [*10]evidence Mr. Sidbury intended to present focused on his capacity to form the requisite mens rea at the time of the crime.[FN9]
The court also impermissibly based its decision to preclude Dr. Goldsmith's testimony on its view that the psychiatric defense would have failed. First, the court could not have made any preliminary threshold determination about the defense{**42 NY3d at 513} without, for example, reviewing the expert's report that had not yet been written. Second, the court's view that a psychiatric defense supported by a qualified expert would fail should not figure into the calculus in deciding whether to allow a late notice, especially where prejudice had not been implicated. Absent some other reason to preclude an expert's testimony (e.g., lack of qualification as an expert), the severe penalty of precluding Mr. Sidbury's defense on the court's own determination about the viability of the defense is not consistent with the proper considerations of a defendant's Sixth Amendment constitutional right.[FN10] Accordingly, the trial court's application of CPL 250.10 was an abuse of discretion.
III.
Mr. Sidbury argues that the evidence was not legally sufficient to sustain a conviction of arson in the second degree. Under Penal Law § 150.15, "[a] person is guilty of arson in the second degree when he intentionally damages a building or motor vehicle by starting a fire."
[2] Two concessions by Mr. Sidbury make it impossible for him to prevail on that claim. First, counsel expressly stated that for the purposes of his legal insufficiency claim, Mr. Sidbury was making no argument based on lack of intent. Second, he explained that although the metal cell door should not be deemed to be a "building" for the purposes of the arson statutes, he could not advance that argument on appeal because Mr. Sidbury's trial counsel had taken the position that the metal door was a "building" within the meaning of Penal Law § 150.15.
[*11]
With those two concessions, the argument pressed by Mr. Sidbury on appeal is that the cuffing port is not part of the door. The Appellate Division found that "rather than being a separate container, [the cuffing port] was a built-in, integral part of the door" (206 AD3d at 414). That conclusion finds support in the record: the cuffing port is bolted into an iron cell{**42 NY3d at 514} door for the purpose of handcuffing and/or delivering food or other items to incarcerated people in solitary confinement. Because it is a necessary part of that door's functionality, and because Mr. Sidbury's counsel conceded the door to his cell is a "building," the evidence that the cuffing port was burned is legally sufficient to sustain his conviction.
Because we have granted Mr. Sidbury a new trial, we have no occasion to address his claim that his trial counsel was ineffective for requesting a charge of fourth-degree arson instead of fifth.
IV.
Accordingly, the order of the Appellate Division should be reversed, and a new trial ordered.

Singas, J. (dissenting in part).
While awaiting trial on murder charges, defendant set a fire in the port of his cell door. Nearly four years, three lawyers, and four CPL 730.30 examinations after he was arraigned on an arson charge, defendant for the first time filed a conclusory notice of intent to introduce psychiatric evidence in his defense. The majority holds that the trial court abused its discretion in excluding this evidence because it impeded the defendant's Sixth Amendment right to present a defense. This simply ignores controlling Supreme Court precedent holding otherwise. Because defendant patently failed to satisfy the substance or procedures necessary to introduce psychiatric [*12]evidence, and because the Supreme Court has consistently, and recently, held that the Federal Constitution does not require courts to weigh prejudice to the prosecution against the defendant's right to present a defense before precluding evidence pursuant to a valid state notice statute, I dissent.[FN1]
I.
In 2013, defendant was arrested for murder and detained while awaiting trial. During his incarceration, in 2014 defendant lit fire to the cuffing port of his jail cell leading to the charges that are the subject of this appeal. Defendant was assigned{**42 NY3d at 515} an attorney,[FN2] who entered a not guilty plea on defendant's behalf at his arraignment in October 2014.[FN3]
At the request of his counsel, defendant underwent multiple CPL 730.30 examinations to determine whether he was fit to proceed to trial, the first occurring in June 2015. The two examining psychiatrists opined that defendant was fit to proceed. Though defendant had psychiatric hospitalizations as a child, the psychiatrists individually concluded that defendant's current actions were manipulative. He met the diagnostic criteria for adjustment and antisocial personality disorders, "marked by repeated violation of laws and social norms, disregard for the rights and well-being of others," and similar traits. Ultimately, however, the psychiatrists believed that defendant did not suffer from a major mental illness and accordingly found defendant fit to proceed to trial. The defense did not raise the possibility of a psychiatric defense.
More than two years later, in October 2017, defendant underwent another round of CPL 730.30 examinations. Both resulting reports again noted defendant's manipulative behaviors and the failure to display any signs or symptoms of a mental illness.[FN4] One psychiatrist concluded that as "a result of his personality issues,[*13][defendant] is likely to be a difficult, uncooperative defendant, who will engage in manipulative gestures and reports to serve his own interests. However, it is clear that he does not suffer from a major mental illness." The other psychiatrist concluded that defendant's uncooperative "behavior is volitional and an attempt to manipulate the legal{**42 NY3d at 516} process to angle for leniency and non-culpability," and that his "act[ing] out in maladaptive aggressive manner in both Court and during the course of his incarceration on Rikers Island" was "not due to a primary mental illness but rather attributed to his character pathology (personality disorder) and sociopathy." Though perhaps "a challenging client," both psychiatrists determined that defendant was fit to proceed. This second examination again did not prompt defendant's attorney to raise the possibility of a psychiatric defense or serve CPL 250.10 notice.
Throughout the litigation, defendant repeatedly acted out and disrupted the court proceedings. At a January 2018 appearance, defendant insisted that he had been found unfit to proceed to trial, despite the two findings to the contrary. Defendant continuously interrupted the judge, accused his lawyer of "do[ing] coke," and twice told the court to "[s]uck my dick." Such conduct was not isolated: at one appearance, he shouted the same vulgarity over 20 times before being removed from the courtroom. When the court warned defendant that he could forfeit his right to be present due to his repeated outbursts, defendant repeatedly told the court to "shut the fuck up." The court then decided to proceed with the trial in defendant's absence, noting that he had "mastered the art of trying to impede this trial from going forward."
Defendant's third and final trial attorney entered the case in mid-2018. Forty-five days later, and nearly four years after the arraignment, defendant filed for the first time a notice of intent to offer psychiatric evidence in support of "the affirmative defense of lack of criminal responsibility by reason of mental disease or defect . . . and/or . . . in connection with any other defense, pursuant to CPL . . . 250.10(1)(c)" and attached the curriculum vitae of psychiatrist Dr. Eric Goldsmith. At a subsequent hearing, defense counsel requested time to have Dr. Goldsmith, who had previously assessed defendant for CPL 730.30 purposes in a different case, examine defendant's state of mind at the time of the crime and prepare a report. In asking for more time, counsel acknowledged that the case was on "the eve of trial but we're not on trial."
The trial court precluded the introduction of such evidence because it was close to four years late, the claim was "invalid," defendant failed to establish good cause for the delay, and the interest of justice did not warrant the late notice. The court concluded that defendant's motion was "dilatory," "manipulation," {**42 NY3d at 517}and "game playing," and noted that defendant's previous lawyers did not demonstrate any intent to bring this defense. As the court explained, the case had been "sitting on the edge of readiness" for six months awaiting the result of a CPL 730.30 report in a separate proceeding. The court [*14]then set a trial date in September, accommodating defense counsel's prior vacation plans. Following the trial, the jury convicted defendant of arson in the second degree.
At sentencing, defendant again began screaming and speaking inappropriately, and twice spat on his attorney. The court removed defendant and sentenced him in his absence. On appeal, the Appellate Division modified the sentence but otherwise affirmed defendant's conviction (see 206 AD3d 413 [1st Dept 2022]). The majority now reverses the Court's unanimous order.
II.
A.
To introduce psychiatric evidence at trial, a defendant must give written notice of such intent to the People and the court (see CPL 250.10 [2]). "[P]sychiatric evidence" is "[e]vidence of mental disease or defect to be offered by the defendant in connection with the affirmative defense of lack of criminal responsibility by reason of mental disease or defect" or "any other defense" (id. § 250.10 [1] [a], [c]). "Such notice must be served and filed before trial and not more than thirty days after entry of the plea of not guilty to the indictment" (id. § 250.10 [2]). CPL 250.10 notice should "contain enough information to enable the prosecution and the court to discern the general nature of the alleged psychiatric malady and its relationship to a particular, proffered defense" (People v Almonor, 93 NY2d 571, 581 [1999]). Thus, we have held that a defendant's notice was inadequate when it stated only that he was diagnosed as suffering from an "acute stress disorder" at the time of the alleged crime but did not connect the disorder to a CPL 250.10 (1) category (id. at 579-580; see also id. at 580 ["A notice that names a disorder untied to a CPL 250.10 (1) category is an abstraction"]).
CPL 250.10 was enacted "to promote procedural fairness and orderliness" and "designed to create a format by which psychiatric evidence may be prepared and presented manageably and efficiently, eliminating the element of surprise" ({**42 NY3d at 518}Almonor, 93 NY2d at 577-578). Its functioning "depends upon proper notification, adversarial examination, and preclusion when appropriate" (id. at 577-578). "CPL 250.10 contemplates timely disclosure so that the trier of fact may benefit, after psychiatric issues are sharpened and engaged to the fullest extent possible" (id. at 581-582). "At the other extreme, and to be avoided, lies the prospect of psychiatric hide and seek" (id. at 582). The 30-day notice provision also "enables the People to have [a] defendant examined by their own experts within close temporal proximity to the offense" (People v Berk, 88 NY2d 257, 265 [1996]; see CPL 250.10 [3]). In short, "untimely notice thwarts CPL 250.10's intended promotion of procedural order, proper notification[,] and adversarial examination" (People v Hill, 4 NY3d 876, 877 [2005]).
But CPL 250.10 does not bar late notice completely: "[i]n the interest of justice and for good cause shown, . . . the court may permit such service and filing to be made at any later time prior to the close of the evidence" (CPL 250.10 [2]). "In order to establish good cause, a defendant must provide an explanation for the delay and demonstrate that the defense has merit" (People v Rizzo, 267 AD2d 1041, 1042 [4th Dept 1999], lv denied 95 NY2d 838 [2000]; accord People v Taglianetti, 183 AD3d 1233, 1233-1234 [4th Dept 2020], lv denied 35 NY3d 1049 [2020]; see also United States v Duggan, 743 F2d 59, 80 [2d Cir 1984] ["cause" "consists not only of explanation for the belatedness of the party's action, but also of a showing of some merit in the position [*15]belatedly to be advanced"]). Late notice is not excusable when "counsel was fully aware that [the] defendant had a long-standing history of mental health problems, including diagnoses of bipolar disorder and schizophrenia, as evidenced by the record of the CPL article 730 hearing, which took place a year before the trial" (People v Silburn, 31 NY3d 144, 160 [2018]).
Moreover, the passage of significant time counsels against permitting a psychiatric defense because it becomes more and more difficult for any psychiatrist to determine a defendant's past mental state (see Berk, 88 NY2d at 265 [noting importance of examination "within close temporal proximity to the offense"]; People v Hill, 10 AD3d 310, 312 [1st Dept 2004] ["examination of defendant three years after the incident at issue would be of questionable value in establishing his state of mind at the time of the incident"], affd 4 NY3d 876 [2005]). We will not disturb a trial court's exclusion of psychiatric evidence absent an abuse of discretion (see Almonor, 93 NY2d at 583).{**42 NY3d at 519}
B.
CPL 250.10 cannot be considered in isolation. As we have recognized, "[e]xclusion of relevant and probative testimony as a sanction for a defendant's failure to comply with a statutory notice requirement implicates a defendant's constitutional right to present witnesses in [their] own defense" (Berk, 88 NY2d at 266, citing US Const 6th Amend). However, just because exclusion implicates those rights does not mean that every exclusion violates the Sixth Amendment's Compulsory Process Clause; "[t]he Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system" (United States v Nobles, 422 US 225, 241 [1975]; see also Washington v Texas, 388 US 14, 23 n 21 [1967]). Rather, a criminal defendant's rights to confront adverse witnesses and to present evidence "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," so long as the restrictions are not "arbitrary or disproportionate to the purposes they are designed to serve" (Rock v Arkansas, 483 US 44, 55-56 [1987]). As such, courts "have long rejected the notion that a statutory pretrial notice requirement somehow . . . is a constitutional violation of the right to present a defense" (Silburn, 31 NY3d at 159).
Indeed, the Supreme Court has "described notice requirements as 'a salutary development which, by increasing the evidence available to both parties, enhances the fairness of the adversary system' " (Michigan v Lucas, 500 US 145, 150-151 [1991], quoting Wardius v Oregon, 412 US 470 [1973]), and which prevent trials from becoming a "poker game" (id. at 150 [internal quotation marks omitted]). "The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case" (Taylor v Illinois, 484 US 400, 410-411 [1988]). As such, the "interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence" (id. at 411). A state's "interest in protecting itself against an eleventh-hour defense is merely one component of the broader public interest in a full and truthful disclosure of critical facts" (id. at 412 [internal quotation marks and footnote omitted]).{**42 NY3d at 520}
The Supreme Court has accordingly upheld a wide variety of notice requirements in analogous situations. In Taylor, the Court upheld the preclusion of testimony from a [*16]proposed defense witness who was not disclosed in response to a pretrial discovery request as a sanction for failure to disclose the witness (see 484 US at 416-418). In Lucas, it held that preclusion of evidence of the defendant's own past sexual conduct with the victim because of the defendant's failure to comply with the notice-and-hearing requirements of Michigan's rape-shield statute was not a per se violation of the Sixth Amendment (see 500 US at 149-153). The Supreme Court reaffirmed these principles in 2013 when it confirmed that the defendant was not denied a right to present a complete defense when he was barred from presenting extrinsic evidence of the victim's prior accusations of sexual assault because he failed to file a notice of intent to do so as required under Nevada law (see Nevada v Jackson, 569 US 505, 510-511 [2013]; see also Williams v Curtin, 613 Fed Appx 461, 468 [6th Cir 2015] [citing Jackson in upholding the preclusion of alibi evidence pursuant to a state notice statute, and noting that Taylor "does not prescribe a comprehensive standard, and it does not mandate interest-balancing"]; Matthews v Carl, 2023 WL 8519807, *9, 2023 US Dist LEXIS 218687, *25 [WD Mich, Dec. 8, 2023, No. 1:22-cv-566] [upholding preclusion of alibi evidence pursuant to a state notice statute and concluding that "the Taylor Court did not hold that the availability of alternative sanctions would preclude suppression of alibi witness testimony"]).[FN5]
Notably absent from any of these Supreme Court cases is a consideration of whether excusing the procedural requirements would prejudice the prosecution in a specific case. Rather, the Jackson Court stated that no "case[ ] clearly establish[es] that the Constitution requires a case-by-case balancing of interests{**42 NY3d at 521} before such a rule can be enforced" (Jackson, 569 US at 510). Though, relying on a Second Circuit case, we have previously referenced the consideration of prejudice in this context (see Berk, 88 NY2d at 266, citing Ronson v Commissioner of Corr. of State of N.Y., 604 F2d 176 [2d Cir 1979]), the Second Circuit later upheld preclusion pursuant to CPL 250.10 without explicit reference to prejudice, distinguishing its earlier decision in Ronson on the grounds that there the prosecution was already on notice of the defendant's intent to rely on an insanity defense and the defendant substantially complied with the notice requirement (see United States v Toner, 728 F2d 115, 123 [2d Cir 1984]). Berk addressed prejudice in a single sentence, in an opinion otherwise concerned with the scope of the [*17]evidence encompassed by CPL 250.10 (see 88 NY2d at 266). It cited only the Federal Constitution and Ronson, a since-curtailed Second Circuit opinion (see id.).[FN6] The Supreme Court has since addressed the interaction between state notice statutes and the Sixth Amendment and clarified that "[t]he Court did not even suggest, much less hold, that it is unconstitutional to enforce such a rule unless a case-by-case balancing of interests weighs in favor of enforcement" (Jackson, 569 US at 511). Ignoring Jackson, and citing only Lucas and older Supreme Court precedent (see majority op at 
507-508, 511), the majority grafts that precise case-by-case analysis disavowed by the Supreme Court onto all cases that implicate a defendant's right to present a defense. That holding is entirely unmoored from Sixth Amendment case law.
III.
Here, the trial court did not err in precluding defendant's psychiatric defense. Initially, CPL 250.10 clearly serves "legitimate {**42 NY3d at 522}interests" and is not "arbitrary or disproportionate" (Rock, 483 US at 55-56; see Ronson, 604 F2d at 178 [CPL 250.10 "serves a legitimate purpose"]; Silburn, 31 NY3d at 173 [Wilson, J., dissenting] [not disputing "that CPL 250.10 furthers a 'compelling' purpose"]). Among other things, the notice rule avoids "psychiatric hide and seek" (Almonor, 93 NY2d at 582) and enables examination in "close temporal proximity to the offense" (Berk, 88 NY2d at 265). These interests are analogous to the "legitimate state interests support[ing] the notice-and-hearing requirement" in the rape shield law challenged in Lucas, including "protect[ing] against surprise to the prosecution" and "permit[ing] a prosecutor to . . . investigate whether such a prior relationship actually existed" and consider its materiality and prejudicial nature (500 US at 149-150).
Though the majority posits that preclusion is inappropriate unless the failure to comply is "designed to obtain a 'tactical advantage' " (majority op at 
508, quoting Lucas, 500 US at 152-153, citing Taylor, 484 US at 413, 417), its conclusion relies on a misreading of the Supreme Court's case law, which holds that willful misconduct is sufficient, but not necessary to preclude a defendant from presenting certain evidence (see Taylor, 484 US at 415 [it "would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony" if the defendant engaged in such misconduct (emphasis added)]; United States v Johnson, 970 F2d 907, [*18]911 [DC Cir 1992] [explaining that Taylor did not state that findings of misconduct were essential for exclusion]). Thus, CPL 250.10's requirements may constitutionally be applied to preclude a defendant from interposing a psychiatric defense.
Here, the majority misunderstands the CPL 250.10 and Sixth Amendment standards and mandates a showing of prejudice where none is required. Initially, defendant's notice clearly fails to satisfy the substantive or procedural requirements of CPL 250.10. Most obviously, the notice is extraordinarily late: it is dated nearly four years after arraignment, far beyond the 30-day statutory deadline. Besides being woefully past due, the purported notice is also substantively deficient. Defendant's notice merely parrots the statutory language, without providing any particularization. Nowhere does the notice contain any information as to the "alleged psychiatric malady" nor its relationship to any defense. Listing CPL 250.10 (1) categories without identifying any disorder is really no notice at all as it{**42 NY3d at 523} withholds from the People information necessary to assess the proffered defense (see Rizzo, 267 AD2d at 1042 [preclusion proper where defendant failed to identify any alleged psychiatric malady or its relationship to a particular defense]). I fail to see how a trial court abuses its discretion by rejecting years late notice that provides essentially zero information.
The majority's attempts to salvage the notice are misguided and ignore our standard of review. The majority points to the record at a July 2018 hearing on the notice as purportedly providing the required information (majority op at 
508-509). But the statute requires "written notice" (CPL 250.10 [2]).[FN7]
The majority further concludes that even if notice was deficient, the court should have provided an adjournment to permit counsel to amend the notice (majority op at 
509). Certainly, we have recognized that in certain circumstances an adjournment may be warranted, but that power is left to the trial court's discretion (see Almonor, 93 NY2d at 582). Here, given the four-year delay to file notice, the fact that the same institutional provider defended the action for the entire pendency of the proceeding, and the extensive history of psychiatric examinations, the court did not abuse its discretion by concluding that the bare bones notice could not be remedied.
Moreover, defendant failed to demonstrate that late notice should have been excused for good cause and in the interest of justice. There was no good cause for the delay because defense counsel had significant advance warning that psychiatric evidence could be relevant. Defendant had multiple CPL article 730 examinations—well before he belatedly gave notice—and the reports noted that defendant had previous psychiatric hospitalizations. Defendant's abhorrent behavior throughout the court proceedings also should have put counsel on notice that a psychiatric defense might have been warranted. [*19]Nevertheless, original counsel decided not to pursue a psychiatric defense, either for some tactical reason or because defendant sat on his rights. In either event, it was not an abuse of discretion{**42 NY3d at 524} to conclude that defendant could not demonstrate good cause (see Silburn, 31 NY3d at 160).[FN8]
Besides giving defense counsel notice, the examinations also cast doubt on the merit and sincerity of defendant's psychiatric defense. None found defendant to be suffering from a major mental illness. Rather, each psychiatrist found defendant to have a pattern of manipulative behavior. As one psychiatrist explained, defendant lashed out "not due to a primary mental illness," but because of "his character pathology." Further, the court noted that Dr. Goldsmith had testified in a separate proceeding that he believed defendant to be unfit for trial, but his conclusions were rejected. Similarly, the court also appropriately considered defendant's dilatory tactics throughout the trial, as they tended to cast doubt on defendant's claim that the extreme delay in interposing his psychiatric defense was excusable. Contrary to the majority's assertion that the trial court "impermissibly based its decision" on its own views (majority op at 
512), the trial court relied on the professional opinions of the doctors as manifested in the CPL 730.30 examination reports to reach conclusions about the defendant's manipulative behavior and the merits of the defense.
CPL 250.10's notice requirement serves legitimate interests and defendant failed to comply with it either procedurally or substantively. The trial court therefore did not abuse its discretion in declining to permit late notice and precluding the evidence here, even absent prejudice to the People.
However, even if the trial court needed to consider prejudice to the People, the record presents ample evidence of it. The court repeated over and over that notice was extraordinarily late. Indeed, defense counsel conceded that his request was on "the eve of trial." Further, the court best understood the dynamics of the trial, and concluded that defendant was "malingering," attempting to "manipulat[e]" the trial, "playing" games, and engaging in "dilatory tactics." The passage of four years would obviously hamper the prosecution's ability to collect evidence relevant to defendant's mental state at the time of the{**42 NY3d at 525} crime because it could lead to faded memories or unavailable witnesses. So too would allowing defendant to interpose the defense at the last minute, which would either limit the People's ability to respond or further delay the trial. The majority faults the trial court for not using the word "prejudice," but ignores that prejudice is plainly evident in this record.
Defendant repeatedly acted out in an apparent attempt to derail the process. The trial judge endured years of defendant's abusive conduct and nevertheless was able to [*20]ensure he received a fair trial. Rather than acknowledge those efforts, the majority selectively quotes from particularly strained exchanges in the record to suggest that the judge was intemperate and failed to adequately protect defendant's rights (see majority op at 
503-504). Not only is that an injustice here, but today's decision will serve as an incentive for others to employ this same successful trial strategy. As the trial court is in the best position to assess the case and prevent manipulation by a defendant engaging in dilatory conduct, we have repeatedly stated that the "trial court is granted broad discretion in making evidentiary rulings in connection with the preclusion or admission of testimony and such rulings should not be disturbed absent an abuse of discretion" (Almonor, 93 NY2d at 583). No such abuse of discretion is evident here. I dissent.
Judges Rivera, Troutman and Halligan concur. Judge Singas dissents in part and votes to affirm in an opinion, in which Judges Garcia and Cannataro concur.
Order reversed and a new trial ordered.

Footnotes

Footnote 1:Mr. Sidbury was convicted of manslaughter and weapons possession in 2017 for the Brooklyn indictment. He received an aggregate sentence of 40 years in prison. His appeal of that judgment remains pending in the Appellate Division.

Footnote 2:In 2015, the Bronx Supreme Court ordered an article 730 examination to determine Mr. Sidbury's fitness to stand trial on the arson charge and a separate charge of assaulting a correction officer. He was found fit on June 30, 2015. In 2016, he was found mentally unfit to stand trial for the charges pending against him in Queens County and was transferred to the Mid-Hudson Forensic Psychiatric Center, from which he was discharged to Rikers Island in November 2016. He was tried and convicted on the homicide and related charges in 2017. He was again referred by Bronx Supreme Court for an article 730 examination later in 2017, and on October 16, 2017, he was found fit to proceed to trial. When, in July 2018, the court set the trial date for Mr. Sidbury's arson charge, it noted that "for I'd say six months . . . [t]his case has been sitting on the edge of readiness for that whole period of time while they played around in Queens with the competency claim and finally resolved it correctly and rationally."

Footnote 3:By contrast, CPL article 730 sets forth the procedure for assessing whether a defendant is incapacitated and therefore not fit for a criminal action to proceed (see CPL 730.30).

Footnote 4:Dr. Goldsmith's attached curriculum vitae showed that he is a board-certified forensic psychiatrist, professor of psychiatry at New York University (NYU), and Residency Supervisor at NYU School of Medicine, and has extensively trained in the intersection of psychiatry and law, spending years as a practicing forensic psychiatrist in both courts and clinics devoted to forensic psychology.

Footnote 5:CPL 250.10 (2) provides that the court may allow a defendant to introduce a psychiatric defense and related expert testimony even if the first notice is given mid-trial. This necessarily contemplates some situations where a mid-trial delay to permit the introduction of new psychiatric evidence may be required as a matter of due process. Additionally, the People's case consisted solely of testimony from three correction officers. The People do not suggest that extending the trial date a few weeks further would have caused the loss of witnesses, documents, or memory. Finally, as we noted in People v Berk, the fact that the defense expert "never examined defendant minimized the prejudice to the People" (88 NY2d at 261, 266). That is also the case here. Although Dr. Goldsmith had evaluated Mr. Sidbury during his CPL 730.30 competency exams, he had not examined him for the specific purpose of proffering psychiatric evidence pursuant to CPL 250.10—whether Mr. Sidbury had the requisite mental capacity to commit arson at the time of the incident.

Footnote 6:Faced with a record in which the People did not assert any prejudice even when affirmatively challenged to do so by defense counsel, the dissent simultaneously sidesteps our case law and assumes the role of inventing arguments for the People (see dissenting op at 
524-525). As noted above, our case law firmly establishes that prejudice to the People is an essential consideration. Where the People failed to assert any prejudice, the dissent now recasts the court's armchair diagnosis of Mr. Sidbury as "malingering" and its repeated emphasis on the lateness of counsel's notice as prejudice to the People. But timeliness and prejudice are two distinct legal concepts, and both CPL 250.10 and our case law sharply draw that distinction (see William C. Donnino, Prac Commentaries, McKinney's Cons Laws of NY, CPL 250.10 [even when notice is untimely, a court may allow the assertion of a defense based on psychiatric testimony when prejudice is absent]; Almonor, 93 NY2d at 582 [expressing "timeliness" as distinct from "good cause, . . . prejudice, and other appropriate considerations"]).

Footnote 7:As the dissent notes, "law office failure may, in certain circumstances, support a showing of good cause" (dissenting op at 
524 n 8), but found it did not do so here because of either "some tactical reason or because defendant sat on his rights" (id. at 
523). People v Hill (4 NY3d 876, 877 [2005]), on which the dissent heavily relies, cuts against their argument. In upholding the preclusion of psychiatric evidence in Hill, the Appellate Division distinguished the case from People v Gracius (6 AD3d 222 [1st Dept 2004]) (see People v Hill, 10 AD3d 310, 311-312 [1st Dept 2004]). The Appellate Division explained that in Gracius, preclusion was improper because the delay was "occasioned by law office failure," the "defendant was originally found unfit to stand trial," and there was no question that "defendant's sanity" would be significant at trial (10 AD3d at 311-312 [internal quotation marks and citation omitted]). As is the case here, in Gracius "the trial court, in its self-designated role of a 'legal gatekeeper,' effectively became an advocate for the People at the expense of defendant's constitutional rights" (6 AD3d at 225). Gracius, thus, aligns with Mr. Sidbury's circumstances. In stark contrast, the facts of Hill clearly demonstrated "vacillating trial tactics" on behalf of defendant's counsel (10 AD3d at 311). We affirmed preclusion because "[d]efendant did not request the examination or announce his intention to pursue an insanity defense until the start of jury selection, having previously stated that, for tactical reasons, he would not do so" (4 NY3d at 877 [emphasis added]). There simply is no record evidence here to point to "vacillating trial tactics" or any "tactical reason" for the delay—much less an affirmative statement that counsel would not present a psychiatric defense for tactical reasons.

Footnote 8:For example, the court stated:
"nobody has seen fit to make any claim whatsoever about a prior, about a section . . . 250.10 claim, nobody's ever made that claim, although there have been claims of incompetence . . . I have repeatedly said myself there's no basis. I said there's no basis and the judge in Queens held there's no basis. It's not 250.10."

Footnote 9:It is inherent in the text and structure of the CPL that an individual may be competent to stand trial and still advance the defense of lack of mens rea at the time of the crime (e.g., temporary insanity, extreme emotional distress, or other psychiatric disturbances). This is because of the difference in legal standards.

Footnote 10:Despite the dissent's mischaracterization of our precedent as saying otherwise (see dissenting op at 
518 ["In order to establish good cause, a defendant must provide an explanation for the delay and demonstrate that the defense has merit" (internal quotation marks and citations omitted)]), we have never held that a court may refuse to allow a psychiatric defense because the court believes the defense lacks merit (subject, of course, to the usual Frye and expert qualification requirements, neither of which is at issue here).

Footnote 1:I agree with the majority that defendant's challenge to the sufficiency of the evidence concerning the arson charge lacks merit.

Footnote 2:The first of three attorneys from the same institutional provider. Multiple attorneys were assigned to handle his case, apparently because of the challenging nature of the representation.

Footnote 3:While detained, defendant engaged in other misbehavior for which he was charged. The trial judge estimated that, at one point, defendant had 12 cases proceeding against him based on conduct within jail. This included an assault on a correction officer with a piece of metal, which caused injury, and for which he was criminally charged separate from this indictment. In addition, defendant set at least one other fire besides the one giving rise to this appeal.

Footnote 4:In a separate Queens County criminal proceeding, defendant was briefly found unfit to proceed. He was admitted to a forensic center before quickly being discharged approximately two weeks later. The center's discharge summary concluded that defendant did not meet the criteria for any anxiety, mood, or psychotic mental illness. Instead, defendant was diagnosed with an antisocial personality disorder because he "demonstrate[d] a lack of regard for the rules and a sense of entitlement which manifests itself in [a] lack of cooperation with the criminal process in an effort to avoid prosecution."

Footnote 5:The majority cites three cases for the proposition that "the right to a fair trial [predominates] over purely procedural requirements, especially where no prejudice would result from waiver of a deadline," but these cases are inapposite (majority op at 
511, citing Wardius, 412 US at 475-476, Chambers v Mississippi, 410 US 284, 295 [1973], and Washington, 388 US at 23). Wardius and Chambers involve Fourteenth Amendment due process challenges, not Sixth Amendment compulsory process challenges. Defendant makes no such challenge here. The rules at issue were invalidated because they were "arbitrary" and "excluded important defense evidence but . . . did not serve any legitimate interests" (Holmes v South Carolina, 547 US 319, 325-326 [2006]). The rules here are far from arbitrary. Washington is a Sixth Amendment case but involves a challenge to an archaic rule which prevented defendant from calling his alleged accomplice as a witness.

Footnote 6:Two of the cases the majority cites as establishing that a prejudice analysis "is embedded in New York" law (majority op at 
509) did not even conduct a prejudice analysis and therefore had no reason to assess the issue (see People v Gonzalez, 22 NY3d 539, 541 [2014] [holding as a matter of statutory interpretation that notice is not required when "the defendant offers no evidence at trial but requests an (extreme emotional disturbance) jury charge based solely upon evidence presented by the People"]; People v Diaz, 15 NY3d 40, 47 [2010] [holding that notice is required under CPL 250.10 to raise an extreme emotional disturbance defense based on the defendant's own testimony]). In Almonor, the defendant did argue that preclusion violated the Sixth Amendment, but, without any discussion of prejudice to the People, we held that the trial court providently exercised its discretion to exclude psychiatric witnesses for failing to comply with CPL 250.10 (93 NY2d at 581).

Footnote 7:Even if it were proper to look at the hearing record, it does not cure the notice's deficiencies (see majority op at 
508-509). Defense counsel simply stated that he believed defendant was not culpable by reason of a mental defect or disease, but this conclusory statement was no different than what was included in the inadequate notice. As the court rightfully stated, this was a conclusion. When questioned for the basis of the claim, defense counsel conceded that he did not know, and that defendant needed to be examined first.

Footnote 8:To get around this, defendant claims that prior counsel rendered ineffective assistance and that the last counsel of record served notice as soon as possible. While so-called law office failure may, in certain circumstances, support a showing of good cause, it does not do so here. Despite defense counsel's contention that the defense was obvious to him, he did not file notice until 45 days after becoming defendant's counsel, beyond the 30-day period set forth in the statute.